# IN RE APPLICATION OF MUSGRAVE ET AL.

PATENTS; PROCESS; VARIATION OF TEMPERATURE;
PATENTABILITY.

1. A decision of the Commissioner of Patents refusing an applica-
tion for a patent for smokeless fuel and process of preparing
it as not being patentable in view of the prior art, *affirmed*.

2. The discovery of a new process in any art by the addition of heat
as a material factor, where heat had not before been applied
or suggested, constitutes invention; but the adoption of a
discretionary temperature in treating coal, subject to increase
or diminution, as experience as well as the varying character
of the material treated may suggest, does not amount to in-
vention.

3. It involves only the exercise of the ordinary faculties to vary the
temperature required in a certain process in which heat is,
essential, even when this variation is great.

No. 56. Patent Appeals. Submitted January 15, 1897. Decided February 10, 1897.

HEARING on an appeal from a decision of the Commis-
sioner of Patents refusing an application for a patent.
*Affirmed*.

The facts are sufficiently stated in the opinion.

*Mr. Melville Church* and *Messrs. Briesen & Knauth* for the
appellant.

*Mr. W. A. Megrath* for the Commissioner of Patents.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an appeal from the decision of the acting Com-
missioner of Patents refusing an application for a patent
embracing the following claims:

"1. As a new article of manufacture, the herein-described
smokeless fuel, consisting of a bituminous fuel, the product
of a partial distillation of bituminous coal at a low heat,
devoid of smoke-producing constituents and retaining a
large percentage of volatile combustible constituents.

" 2. The herein-described process of preparing a smoke-less fuel, which consists in subjecting bituminous coal to partial distillation at a low heat and maintaining the heat for a sufficient length of time to drive off only the lighter luminous and volatile hydrocarbons without removing the heat-yielding hydrocarbon constituents, substantially as described."

In their specification appellants say:

" Inasmuch as bituminous coal is by.far the most commonly used fuel, especially for domestic consumption, it is the chief aim of our invention to so prepare ordinary bituminous coal that the same shall be deprived of substantially all of its smoke-producing constituents while at the same time retaining substantially all of its heating constituents, and is rendered suitable for burning without the production of smoke, not only in closed stoves, furnaces, and under boilers, etc., but also in open grates, in which heretofore it has not been possible to avoid the production of smoke in burning bituminous coal.

" This we accomplish by subjecting the coal to a partial distillation at low temperature in such manner as to drive off only those constituents which are distilled from coal at such low temperatures as not to be oxidized in the presence of a free supply of air or oxygen, and which consequently pass off in ordinary combustion as smoke, while at the same time we avoid the combustion of the coal and retain in it substantially all those constituents whose combustion affords heat.

"In practicing our invention we take bituminous coal, preferably in the lump, but other forms may be used, if desired, and charge the same into suitable distilling apparatus, which may be either an ordinary coke oven, gas retort, or other receptacle in which the coal can be subjected to heat with the practical exclusion of atmospheric air, or the process may be carried on in open heaps covered with earth or other suitable material. Heat is applied gradually

to the mass in the receptacle, and its effect is to drive off the most volatile constituents of the mass, such as upon perfect combustion are chiefly luminous and on incomplete combustion form smoke, together with the moisture and other light gaseous compounds which volatilize profusely when bituminous coal is first subjected to heat, as in ordinary firing of furnaces, stoves and grates. The light gases and hydrocarbons thus thrown off may be, and in practice are, collected and utilized for industrial purposes.

"The heat is preferably increased only to the point necessary for the removal of the smoke-making constituents. This temperature is below that necessary for the fusion of the fixed carbon and for driving off the heat-producing volatile compounds. This temperature will vary with the varying conditions of practice, but for the purposes of this specification it may be stated as above 550 degrees Fahrenheit. When the smoke is no longer given off, the charge is drawn and quenched. The resulting product is not a coke, but retains approximately the composition of bituminous coal, and is in fact a bituminous coal containing a smaller percentage of volatile hydrocarbons than the ordinary or natural coal from which the product was made. This material burns freely, without smoke, holds fire well, and is in every way well adapted for use wherever bituminous coal is used; being in fact a smokeless bituminous coal."

The utility of the fuel thus manufactured is conceded, and it seems to have given satisfaction in the market for smokeless coal.

The claims were rejected for want of patentable novelty by the special examiner, and his decision has in turn been affirmed by the examiners-in-chief and the acting Commissioner.

The references in their opinions to anticipations are the British patents of Morgan and Scott-Moncrieff and the American patent, No. 98,606, issued to William John Lynd, January 4, 1870.

In the specifications of the patent of Scott-Moncrieff, his purpose and process are thus described:

"According to my improvements ordinary bituminous coal can be converted into an improved and novel kind of fuel of great commercial value, and during thé treatment thereof the gases and by-products of distillation are preserved and utilized and the product has the advantages of giving out greater heat than ordinary coal and of being comparatively smokeléss, and it may be turned out in any convenient commercial form. In carrying out my invention I employ only apparatus now in common use, but the mode of application thereof is novel and advantageous.

"The required apparatus as is hereinafter shown are so well understood that illustrations are not necessary to a full description of my invention.

"In the treatment of the raw fuel material to produce the novel kind of fuel which is the subject of my invention, I subject ordinary coal to the usual process of distillation as carried out in the production of coal gas on a commercial scale, but instead of allowing the coal to remain in the retorts during the full period usually given for the production of gas and coke, I stop the distillation at a convenient period, that is, when the coal is in a condition most suitable for compression into a solid and cohesive mass. This may be, for example, in from one-third to one-half of the time usually allowed for complete distillation, the time varying with the nature of the coal under treatment. I stop the distilling process either by withdrawing, or by thrusting out the charge from the retort by means of openings and doors provided at one or both ends of the retort, and in such manner as to fill strong, close vessels, or chambers, or moulds of suitable size and shape, made preferably of cast iron or other suitable material; I then subject the partially distilled coat thus loosely contained in these vessels or moulds to a high pressure and thoroughly compress it into a solid and cohesive mass."

Lynd described his invention as a process for treating the coals of Colorado and elsewhere " called by some dry bituminous, and by others glance, and commonly called lignite," so that they could be used in place of coke, charcoal and anthracite coal for smelting, blacksmithing and other uses.

"The coal is placed in a retort, or other receptacle, large or small (of any suitable material), put over, or in, or attached to a furnace or other structure, so as to receive the heat necessary to expel the bitumen, sulphur and other extraneous or volatile matter. Heat is applied, and when the foreign or volatile matters are driven out, a light charred substance, easily lighted, and giving out intense heat, remains."

He adds : " In this preparation of the coal, the retort will require usually to be heated to a cherry-red heat, and maintained for some time at that heat."

It is understood that the cherry-red heat of the retort indicates a temperature of from 1500° to 1600° Fahr.

The description of their respective processes show that each inventor, being thoroughly familiar with the old art of producing coke through the distillation of coal, aimed at the production of a new and different fuel in which, as far as practicable, the heat-producing constituents of bituminous coal might be retained, while the smoke-producing ones should be expelled. The product sought was something between the crude coal and coke, and was to be obtained by stopping the process of distillation before reaching the coking stage.

Conceding that the finished products of the several processes are not identical and that a quantitative analysis would show discrepancies materially affecting their comparative utility and excellence, still they are of the same chemical species.

The final step in the process of Scott-Moncrieff, by which the smokeless fuel is pressed into blocks, must be ignored

in considering the differences, in respect of invention or patentable novelty, between his product and process and those of the appellants, because it is a mere mechanical operation, resorted to for convenience in handling, that may be carried on or omitted without relation to or influence upon the process of manufacture of the article itself. His specifications distinctly called for the reduction of " ordinary bituminous coal," and there is nothing in them to support the contention that he contemplated the utilization of small fragments or slack only, that could not otherwise be easily handled and applied as fuel, by fusion at a high heat and compression into blocks that could be handled with the same facility as lump coal.. It is true that he proposes to stop the distillation before reaching the coking stage, " at a convenient period," that is indicated by a condition of the fused mass most suitable for compression into a solid mass; but this appears to indicate merely a time when, the new product being regarded as finished, the destructive distillation should cease, rather than a special condition of the fused mass most suitable for compression into blocks, as the prime object for the attainment of which the process had been invented.

The partial distillation of bituminous coal of every quality into a smokeless fuel other than coke was plainly the prime object of the inventor, and compression into blocks or cakes for handling and for use was merely incidental.

Lynd is not perfectly clear in the details of his specifications, though he certainly contemplates the production of a smokeless fuel distinct from coke from certain low grades of coal under process of distillation at a high temperature.

The invention of Scott-Moncrieff is confessedly nearest to that claimed by appellants, and to it special attention is directed.

With much earnestness the appellants contend that there is an essential difference between their product and that of Scott-Moncrieff and others; that the other processes neces-

sarily expel the heat-producing constituents that enter into the bituminous elements of the coal—namely, dead oil and pitch—and that as a necessary result their own product, which retains these and expels only the smoke-producing constituents, volatile at a comparatively low temperature, is not only different, but far superior also in all respects. If this were conceded as to the product, it would not be a necessary conclusion that the improvements made by appellants in the process of making smokeless fuel from bituminous coals was an original conception and a patentable invention or discovery. To be patentable the process must appear to contain a new idea distinct from any conception that has preceded it, as well as productive of something new and useful. *Tilghman* v. *Proctor*, 102 U. S. 707, 733 ; *Pearce* v. *Mulford*, 102 U. S. 112, 118 ; *Hill* v. *Wooster*, 132 U. S. 693, 701 ; *Burt* v. *Evory*, 133 U. S. 349, 358 ; *Durham* v. *Seymour*, 6 App. D. C. 78, 102.

In *Tilghman* v. *Proctor, supra* (p. 728), it was said: "The mixing of certain substances together, or the heating of the substances to a certain temperature, is a process. If the mode of doing it, or the apparatus in or by which it 'may be done, is sufficiently obvious to suggest itself to a person skilled in the particular art, it is enough, in the patent, to point out the process to be performed, without giving supererogatory directions as to the apparatus or method to be employed. If the mode of applying the process is not obvious, then a description of a particular mode by which it may' be applied is sufficient. There is, then, a description of the process and of one practical mode in which it may be applied. Perhaps the process is susceptible of being applied in many modes and by the use of many forms of apparatus. The inventor is not bound to describe them all in order to secure to himself the exclusive right to the process, if he is really its inventor or discoverer."

Appellants' claim to the discovery of a distinctively new idea, and through it of a new and patentable process, is

founded in the comparatively low degree of temperature—about 550° Fahrenheit—to be maintained in the distillation, to which alone they attribute the exceptional character and excellence of their fuel; and they assert that the other processes all contemplate and require the same high degree of temperature—about 1,600° Fahrenheit—usual and necessary in the production of coke or illuminating gas, and hence necessarily expel many of the heat-producing constituents of the coal along with those that produce the objectionable smoke. They claim to have been the first and only persons to discover that a result, as well as the best of results, could be obtained at the lower degree of temperature, and that this discovery constitutes invention.

It may be regarded as settled that the discovery of a new process in any art by the addition of heat as a material factor, where heat had never before been applied or suggested, would constitute invention and entitle the discoverer to a patent. *Harford* v. *Neilson*, Webs. P. C. 275, 371; Id. 712; *Tilghman* v. *Proctor*, 102 U. S. 707, 728. And the case last cited is relied on by the appellants in support of their contention. But, applying the doctrine hereinbefore quoted from that case to the facts presented by this record, we think it clear that their claim is not maintainable. Admitting that the introduction of heat as a distinct feature of a process producing a new and useful result would make that process patentable does not cover their case. We do not find it necessary to determine the question whether in a manufacture where heat is a well known and necessary element of the process the adoption of an arbitrary degree of temperature under all circumstances, differing in the extreme from that required or permitted in all others, would create a new and patentable process, for the facts do not present it. It is true that in *Mitchell* v. *Tilghman*, 19 Wall. 287, the majority of the court did attach much importance to a difference in temperature of about 200° Fahren-

heit between rival processes for the manufacture of fat-acids; but the case chiefly turned upon the difference in the apparatus used by the respective parties. That case, however, was overruled in the later case of *Tilghman* v. *Proctor*, *supra*, wherein the patent of Tilghman for the process was finally upheld without regard to differences between their apparatus or degrees of temperature. In explaining the conclusion reached in the latter case (709), Mr. Justice Bradley said: "In the case of Mitchell, the majority of the court was of opinion that in the application of the process thus claimed the patentee was confined to the use of the process particularly pointed out in the specification; and as, by that, it was proposed to produce a very rapid separation of the fatty elements by the use of a high degree of heat, the operation being effected in the space of ten minutes by forcing the fat, mixed with water, through a long coil of strong iron tube passing through an oven or furnace where it was subjected to a temperature of melting lead, or 612° Fahrenheit; it was concluded by the court that the producing of the same result in a boiler subjected to only 400° Fahrenheit, and requiring a period of several hours to affect the desired separation, was not an infringement of the patent, although the process by which the effect was produced —namely, the action of water in intimate mixture with fat, at a high temperature and under a sufficient pressure to prevent the formation of steam—was undoubtedly the same. On further reflection, we are of opinion that, in the case referred to, sufficient consideration was not given to the fact that the patent is for a process, and not for any specific mechanism for carrying such process into effect.

In this case, as in that, we think it quite plain that the precise degree of heat is not of the essence of the process, either of appellants or of the patents in reference. In their specification appellants say: "This temperature will vary with the varying conditions of practice, but for the pur-

poses of this specification it may be stated as about 550° Fahrenheit. When the smoke is no longer given off the charge is drawn and quenched."

Scott-Moncrief, on the other hand, says: "I subject ordinary coal to the usual process of distillation as carried out in the production of coal gas on a commercial scale, but instead of allowing the coal to remain in the retorts during the full period usually given for the production of gas and coke, I stop the distillation at a convenient period; that is, when the coal is in a condition most suitable for compression into a solid mass. This may be, for example, in from one-third to one-half of the time usually allowed for complete distillation, the time varying with the nature of the coal under treatment."

As we have heretofore said, the prime object of Scott-Moncrief, as of appellants, was to produce a smokeless fuel retaining all the heat-producing constituents of the coals so far as possible in so doing; and, as was said in *Tilghman* v. *Proctor*, *supra*, if the mode for producing the desired result were obvious the discoverer would not be required to point it out. If not obvious, but susceptible of being attained in several different modes or by different apparatus, the discoverer is not bound to describe them all in order to secure to himself the exclusive right to the process.

Scott-Moncrieff certainly does not bind himself to the use of a very high degree of temperature as essential to his process. He seems, like Tilghman in his process of producing fat-acids, to have regarded time as an important consideration, and therefore proposed the high temperature for the purpose of expedition. On the other hand, the appellants, while proposing a lower temperature, do not limit themselves thereto.

Evidently each party in the practical use of his process proposes to be controlled by the main object, and the degree of temperature to be applied is a matter of discretion, subject to increase or diminution, as experience, as well as

the varying character of the coals, may suggest the expediency.

Assuming, then, what is not perfectly clear, that the high temperature of the Scott-Moncrieff process would, along with the smoke-producing constituents of ordinary coals, and notwithstanding the shorter period of distillation, expel some of the heat-producing constituents also and thus produce a fuel inferior to that of appellants, we still cannot find that their discovery of the effectiveness of the lower temperature amounted to invention.

It seems to us reasonably clear that this variation in the degrees of temperature, though great, ought readily to have occurred to one skilled in the art of putting into practical operation the process of Scott-Moncrieff or even that of Lynd. The improvement in the art involved, in our judgment, " only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice ; and is in no sense the creative work of that inventive faculty which it is the purpose of the Constitution and the patent laws to encourage and reward." *Hollister* v. *Benedict Mfg. Co.*, 113 U. S. 59, 73 ; *Thompson* v. *Boisselier*, 114 U. S. 10, 13 ; *Burt* v. *Evory*, 133 U. S. 349, 358.

Finding no error in the record, we must affirm the decision appealed from, and order the proceedings and decision here to be certified to the Commissioner of Patents in accordance with the law in such cases provided. It is so ordered.

*Affirmed.*