NATIONAL NEWSBOARD CO. v. ELKHART EGG CASE CO.*

(Circuit Court of Appeals, Seventh Circuit. April 14, 1903.)

No. 939.

1. PATENTS—INFRINGEMENT—PAPER BOARD.
    The McEwan patent, No. 492,927, for a paper board made from news-papers or other printed paper by a process described, the essential feature of which is the retaining of as much of the oils contained in the printer's ink as possible, instead of eliminating as much as possible, as was done in the prior art, by means of alkalis, is infringed by board made by a process having the same end in view, and which is only colorably differ-ent, by the use of a slight quantity of alkali, and substituting cold water for hot in one part of the process.

Appeal from the Circuit Court of the United States for the District of Indiana.

For opinion below, see 115 Fed. 328.

The suit in the Circuit Court was to restrain infringement of letters patent, No. 492,927, issued to Robert B. McEwan and others, for a new and useful improvement in paper board. The bill was dismissed for want of equity, and from this order this appeal is prosecuted.

The material portion of the patent, together with the claim is as follows:

"Our invention relates to the manufacture of paper-board, box-board and the like from newspapers or other similar printed white paper.

Our object is to obtain a quality of board which is superior to the different varieties now on the market, but which can be produced at less cost than any of the said varieties of board of a quality approaching that of ours.

In the manufacture of our improved article we preferably use, on account of its cheapness, its freedom from size and its softness, printed newspaper or other printed paper possessing the characteristic properties of the ordinary paper upon which newspapers are printed, and we have found that old copies of newspapers or the over-issues can be bought up at low rates and utilized for our purpose.

We have found that our improved product can be manufactured most economically and with the best results by following the process which is described below, but it will be understood that the product can be obtained in other ways. In the process referred to we first cleanse the stock from dust and foreign matter and soak it in hot water until it is thoroughly soft. Without permitting it to cool we then transfer it to the beating-engine, and when the pulp is sufficiently beaten it is allowed to pass to the stuff-chest from which it is pumped to the making-cylinder vat, and at all times it is kept as hot as possible under the circumstances. We find that this process

---

* Rehearing denied May 15, 1903.

is expeditious because when the ink on the paper has once been softened by the hot water it is thereafter kept soft instead of being set again by the use of cold water at any point, and the permanent particles of the ink which are not dissolved and washed away are therefore during the beating more readily subdivided with exceeding minuteness and are thoroughly and uniformly distributed throughout and blended with the fibers.

Our novel product, whether made by the process above described, or by any other which may be used in its stead, is a board which has the permanent particles of printers' ink minutely subdivided and uniformly distributed throughout its body to produce a smooth and even tint throughout, while the strength of the fibers has not been impaired by more or less expensive attempts to bleach out the ink.

We desire it to be understood that by the term "newspaper" as used herein, we mean to include paper upon which newspapers, circulars, and the like have been printed and we propose generally to use old copies of newspapers and over-issues for the manufacture of our product. It will also be understood that in practice, if so required for special purposes, we may mix with the newspapers a slight proportion of other paper or of raw fiber.

We claim as our invention— .

As a new article of manufacture, a paperboard formed from printed newspaper or the like, ground to a pulp and having the permanent particles of the printers' ink minutely subdivided and uniformly distributed throughout the body of the board, whereby a smooth and even tint is imparted to the board."

The appellees manufactured their board substantially as follows: The newspaper stock was put in a rotary boiler, with one per cent. or less by weight of soda ash, and the usual quantity of water to cover the stock while it was being cooked. The temperature is not stated. The hours of boiling are variously stated—appellees and their witnesses disagreeing in this respect. After the boiling, the stock was beat in cold water.

The further facts are stated in the opinion of the Court.

Arthur v. Briesen, for appellant.

Horace Pettit and John M. Van Fleet, for appellee.

Before JENKINS and GROSSCUP, Circuit Judges, and BUNN, District Judge.

After the foregoing statement of facts, GROSSCUP, Circuit Judge, delivered the opinion of the Court:

The patent is for a new product. This product differs from antecedent paper board in that it contains oils, commonly found in ink, which give to the board a toughness and elasticity hitherto unknown. The board can be manufactured from old newspapers, the ink oils formerly eliminated, being now utilized; and this, though incidental, is a valuable feature of the patent. The validity of the patent has been sustained in the Circuit Court of the United States for the District of Connecticut; and in the Circuit Court for the District of New Jersey; and is admitted in the answer of appellees.

Prior to the patent in suit, newspapers were sometimes utilized in the manufacture of paper board; but in such process the effort was to separate the carbon of the ink from the oil—the oil being taken out by alkali and bleaching, leaving the carbon for coloring matter. The alkali employed usually was soda ash, in quantities from ten to twenty pounds per one hundred weight of paper, in addition to the solution left over from the preceding operation; its causticity sometimes being increased by boiling with caustic lime. In this way the oil of the printing ink was converted into soluble soap, and thus washed or bleached out of the pulp fibre.

It is manifest, that in practical operation, under the process mentioned in the patent in suit, the oils cannot be entirely retained; a small portion will be lost in the boiling and beating process calculated to minutely subdivide and distribute the oils throughout the fibers. It is manifest, also, that in the process employed in the previous art, a small portion of the oils were not eliminated; no amount of boiling or bleaching could completely purify the pulp. But in the process under the patent, the purpose is to lose as little as possible; in the previous art, the purpose was to eliminate as much as possible. The processes are in purpose, and in effect, so far as is practicable, the opposites of each other. And though the purpose of each partially fails, the results are so widely different that both the process and the paper board are commercially distinct.

The appellees began by making paper board in accordance with the process described in the patent. Upon notice to take out a license they changed the process in some respects, among others in the introduction of about one per cent. of soda ash, and in the beating in cold water instead of hot water. But there was no attempt at bleaching after the boiling, and the alkali was insufficient to remove but little of the oils. Plainly the removal of the oils was not intended. The whole testimony impresses us with the belief that the introduction of the soda ash was intended, not to bring about a product essentially different from the patented product, but to interpose a process so colorably different that it might be used as a shelter against the charge of infringement; and in this respect we are constrained to look upon the defense of infringement differently from the view taken by the Circuit Court. The decree of the Circuit Court must be reversed, with instructions to enter a decree for an injunction as prayed for in the bill.