NATIONAL ENAMELING & STAMPING CO. et al. v. NEW ENGLAND
ENAMELING CO.

(Circuit Court, S. D. New York.  June 28, 1905.)

1. PATENTS—PROCESS—VALIDITY.
    If the inventor of a process in the claims of his patent therefor has
so defined his ingredients that there can be no mistake as to what he
means, and has indicated a process which will transform those ingredients
into the product claimed, it is immaterial that he was wholly ignorant
of all of the chemical changes that take place in the course of such pro-
cess, and such fact will not defeat the patent, but it may properly be
taken into consideration in construing the language and terms used in the
specification in describing the process.

2. SAME—INFRINGEMENT—ENAMELING METAL WARE.
    The Claus patent, No. 527,361, for enameling metal ware, covering both
the process and product, is not a broad and fundamental one, but dis-
closes novelty and patentable invention when considered as an entirety
and limited to a process (and product) wherein mottles are formed in a
single coat of enamel as the result of a partial oxidation of the metal sur-
face, produced by the action of metallic salts applied to an enamel while
still moist, either on the article or in the dip, the ingredients of which
enamel show a great preponderance of alkaline substances, but which
nevertheless does not neutralize the metallic salts, but facilitates their
presentation to the surface of the metal while still efficient as oxidizing
agents.  Claim 1 held void as too broad in view of the prior art, and
claims 2 and 3 because they make no reference to the mottles nor to the
intense alkalinity of the "mix" from which the enamel is made, which is
the essential feature of the invention.  Claims 4 to 8, covering the prod-
uct, and 9 to 12, covering the process, held valid and infringed.

3. SAME.
    Infringement of a patent for the enameling of metal ware by applying
a single coat of mottled enamel as described is not avoided by the apply-
ing of a second coat, where, in applying the first, the process of the patent
is used, and the product is an infringing article, and the second is merely
a transparent coat of different material, and differently applied.

This cause comes here at final hearing upon pleadings and proofs.
It is a suit in equity for infringement of United States patent No.
527,361, October 9, 1894 (on application filed November 18, 1893),
to Hubert Claus for enameling metal ware.

See 126 Fed. 436.

Arthur v. Briesen, Walter D. Edmonds, and Louis Marshall, for
complainants.

Kenyon & Kenyon, Steinhardt & Goldman, and Walter F. Rogers,
for defendant.

LACOMBE, Circuit Judge.  The specification states that the
"invention consists in the process of enameling and the article of
manufacture hereinafter set forth and claimed"; that it relates to
enameling metal ware, and "has for its object to coat steel or other
homogeneous metallic surfaces, such as the Siemens, Martin, and
Thomas products, with a single cost of enamel exhibiting mottled
effects."  The specification proceeds:

"Heretofore it has been customary to coat iron, meaning fibrous iron, with
a mottled enamel by oxidizing the surface with free acid contained in or ap-
plied to the enamel.  This process has been found unavailable for coating
steel or other homogeneous metallic surfaces with a mottled enamel on ac-
count of the density and homogenity of the metal and for other reasons.

"According to my invention I·prepare an intensely alkaline enamel, preferably by mixing various more or less vitrifiable substances, some of which are alkaline, the alkaline constituents of the mass being in great preponderance. This alkaline enamel may, however, be variously compounded, the essential feature being to obtain as a preliminary step an enamel which will give a strongly alkaline reaction. This enamel may be brought to the proper condition for applying to the surface to be coated in any suitable manner, such as by the common process of melting, grinding, and mixing with water. This intensely alkaline enamel is very refractory, and the high melting point increases the power of resistance of the enamel against chemical influences, and also brings about the intimate union of the metal and the enamel during the process of burning. The surface to be coated is cleaned and the alkaline enamel applied in a thin layer in any suitable manner. The metallic salts are now applied to the enamel coating by dusting or by sprinkling, or the salts may be mixed with the enamel before it is applied to the surface to be coated. The reactions between the alkaline constituents of the enamel coating and the metallic salts bring about oxidation, the oxides permeating the coating, and producing, when burned, a beautiful mottled effect closely resembling coarse-grained broken granite. [The 'oxidation' thus brought about refers manifestly to oxidation of the surface of the metal.] The oxide in certain cases may be directly produced by the reactions between the alkaline enamel and the metallic salts.

"Having thus set forth my process, I will now describe specifically one mode of enameling under that process, giving proportions and ingredients, it being expressly understood that I in no manner limit myself to the proportions nor to the ingredients thus set forth in this specific process, as it is only one of the many forms in which my invention may be clothed.

"I prepare an enamel by mixing the following ingredients in about the proportions specified, viz.: 130 parts by weight feldspar; 125 parts by weight borax; 70 parts by weight quartz; 25 parts by weight soda; 17 parts by weight saltpeter. To these I may add a small proportion of fluorspar and cobalt or either.

"Various other ingredients may be used instead of the ingredients specified, it being merely necessary to preserve to the enamel an intensely alkaline characteristic. In this instance it will be observed that certain alkaline ingredients, notably feldspar, are greatly in preponderance, thus imparting to the mass an intensely alkaline characteristic, which, as above pointed out, is essential. The ingredients, having been intimately mixed, are molten together and ground with water, which is most conveniently done, as is well known, by adding fatty clay while grinding, until the enamel can be spread out in a thin coherent layer. This enamel is applied to the clean steel surface, and while still moist a mixture of equal parts of pulverized sulphate of copper and pulverized sulphate of iron is applied thereto, as by sprinkling or dusting. I prefer to use both these metallic salts, but may use either alone, or equivalent metallic salts. By the dissolution of these metallic salts, which begins the moment they touch the enamel, the enamel is coagulated; that is to say, watery masses are formed in proximity to more coherent masses. The watery masses are produced by the sulphate of copper, and the tough or more coherent masses by the sulphate of iron. The solution of sulphate of copper descends through the watery masses until it reaches the metallic surface and a ferrous sulphate produced by the contact of the liberated acid with the steel. This ferrous sulphate is changed by the alkaline enamel into oxide of iron, which grows crystal-like from the metallic surface outwards and produces a spotting or mottling appearance on the surface.

"The particles of sulphate of iron are confined to the surface of the coagulated enamel by the tougher portions thereof, and are transformed by the alkaline enamel into ferrous silicate or borate. The unstable ferrous combinations quickly become ferric, and result in a growth of rust spots from the surface of the enamel downward. These various oxide spots produced by the metallic salts impart to the enamel, when burned, a beautiful mottled appearance.

"The character of the mottling may be varied by varying the size of the particles of the salts, and the effect can be materially enhanced by adding

hypomanganate of potassium to the salts that are sprinkled on, or by previously mixing it together with the said salts, or either of them, or alone with the enamel mixture. The enamel when sprinkled is dried by mere exposure to the air, and then burned. A single coat of this enamel is effective for all practical purposes; but of course nothing herein stated is to be understood as precluding the application of several coats.

"The effect of the process is to produce an article wherein the steel or homogeneous iron surface upon which the coat of mottled enamel is superposed is partly oxidized."

Here follows a description of the drawings representing the mottles. The claims in controversy read as follows:

"(1) As a new article of manufacture, a steel or homogeneous iron article having one coat of mottled enamel.

"(2) As a new article of manufacture, a steel or homogeneous iron article having one enamel coat having therein a preponderance of alkaline constituents.

"(3) As a new article of manufacture, a steel or homogeneous iron article having a single enamel coat of an intensely alkaline nature.

"(4) As a new article of manufacture, a metallic article having a coat of enamel of an intensely alkaline nature permeated by metallic oxides, substantially as described.

"(5) As a new article of manufacture, a steel or homogeneous iron article having a single coat of mottled enamel on a partly oxidized metallic surface, substantially as described.

"(6) As a new article of manufacture, a metallic article having a mottled coat of alkaline enamel and within said enamel metallic oxides extending from the outer surface of the enamel inwardly, substantially as described.

"(7) As a new article of manufacture, a steel or homogeneous iron article having a mottled coat on a partly oxidized metallic surface, and having metallic oxides extending from the outer surface of the enamel inwardly, substantially as described.

"(8) An enamel for surfaces having therein a preponderance of alkaline constituents together with metallic oxides, substantially as described.

"(9) The process of enameling which consists in coating an article with an alkaline enamel, and in applying thereto, while still moist, a metallic salt or salts, substantially as described.

"(10) The process of enameling which consists in coating an article with an alkaline enamel, and in applying thereto, while still moist, sulphate of iron and sulphate of copper, substantially as described.

"(11) The process of enameling which consists in coating an article with an alkaline enamel, and in applying thereto, while still moist, sulphate of iron, substantially as described.

"(12) The process of enameling which consists in coating an article with an alkaline enamel, and in applying thereto, while still moist, sulphate of copper, substantially as described."

There is a thirteenth claim, which is not in controversy, and therefore need not be recited.

The drawings showing the mottles and the description of the drawings were inserted on suggestion of the Patent Office. The words "hyper-manganate of kali" in original application were changed to "hyper-manganate of potassium." The paragraph which states that the effect of the process is to partly oxidize the metal surface was added while the application was in the office. These changes are manifestly immaterial. The only other modification which the file wrapper discloses is in the sentence which now reads: "To this end my invention consists in the process of enameling, and the article of manufacture hereinafter set forth and claimed." In the original it reads: "To this end my invention

consists broadly in applying an intensely alkaline enamel coating to steel or steel-like surfaces and producing the mottles by means of the chemical action of metallic salts applied to the enamel by being mixed therewith or by being applied to the enamel coat while the said coat is still moist." Defendant contends that the change imports a limitation of the original application. This seems not to be a fair inference. The original statement referred solely to a process; the amended one covers both process and product. The original sentence stated in detail that the metallic salts might be applied to the enamel either by being mixed with it or by being applied to the moist·coat; the amended sentence gives no details, but defines the process as the one "hereinafter set forth and claimed." Subsequently in the specification the application of the salts by dusting on the wet coat is described elaborately in what the patentee says is "one mode of enameling" under his process —"only one of the many forms in which my invention may be clothed." But it is expressly stated that besides being dusted or sprinkled "the salts may be mixed with the enamel before it is applied to the surface to be coated." Further down in the specification it is stated that the mottling effect can be enhanced by adding hypomanganate of potassium to the salts that are sprinkled on, or by mixing the hypomanganate together with the said salts with the enamel mixture. It does not seem, therefore, to be a fair contention that the applicant, by any action of his in the Patent Office, abandoned so much of his process as contemplated mixing the metallic salts with the enamel while in its pasty state before application to the metal surface. Every one of the twelve claims was allowed in the precise language of the original application.

As appears from the specification, the invention is concerned with applying enamel to steel in contradistinction to iron. Wrought iron is a fibrous structure, between the fibers of which strands of vitrifiable slag are interposed. When an enamel is applied to sheet iron, this slag is rendered fluid by the high temperature, and combines or coalesces with the layer of enamel, and serves to dovetail, as it were, the enamel into the sheet iron, thus forming a coating which adheres directly to the metal; and as the metal surface in use expands or contracts when heated or cooled, the enamel follows it, possessing sufficient elasticity to do so. Besides this quality of elasticity, the enamel, when applied to cooking utensils (one of its principal uses), must be refractory, so as to prevent its being soluble in fruit juices, etc. Before the patent in suit so-called "mottled" enameled ware sold under various names had become very popular, and, if well made and durable, commanded a ready sale. As practiced generally before the Claus patent, this mottled ware was produced by first applying and burning on a ground coat of some uniform color, frequently dark, and then upon that as a foundation applying a decorative coat.

The use of sheet steel in the metal articles to be enameled, especially when they are to be used in cooking, presented difficulties not experienced in the case of fibrous iron. Sheet iron expands and contracts slowly in the presence of heat and cold; sheet steel ex-

pands and contracts rapidly under the same conditions. It is necessary therefore to secure greater elasticity in the enamel so that it will follow the rapid motion of the particles of steel, and yet not break; but such elasticity must not interfere with its refractoriness. Moreover, since the steel is homogeneous without vitrifiable slag, it presents no convenient anchorages to which the enamel may attach itself. In order to secure adherence, artificial anchorages must be created. This is done by exposing the surface of the steel to the action of acids, thus scarring it sufficiently for the molten enamel to seize hold of it. The theory of the Claus invention, as stated by complainants' experts and counsel, is as follows: He did away altogether with the use of any ground coat, compounding an enamel which would by the application of a single coat adhere to the steel surface, and on cooling exhibit the ornamental mottles desired. The composition of this enamel was such that it was sufficiently elastic to be a good adherent, and at the same time sufficiently refractory to be valuable on cooking articles. To affix it to the steel surface he added at a certain stage of the process metallic salts, which not only ornament the coat by producing mottles, but also attack the steel, corrode it in isolated places, forming pock-marks therein, into which the enamel then extends root-fashion to fasten the enamel coating to the metal body. The mottles visible on the completed article indicate places where the enamel is thus anchored to the steel surface. It is understood that the above-recited differences between the structures of iron and steel, the methods of securing adhesion, and the action of metallic salts both in mottling and in oxidizing the metal in isolated places simultaneously are not seriously controverted. Defendant insists that it does not use the process nor make the product of the patent, and that the composition of matter which Claus described disclosed no patentable novelty.

Before undertaking to determine precisely what the specification does disclose, it will be well to learn something of the personal equation of its author. Its language is apparently clear and simple, and a layman, observing its frequent use of chemical terms and its exposition of chemical processes, would naturally suppose that Claus was an experienced chemist. The exact converse is the case. However clever he may have been as a practical enameler, and however ingenious in contriving improvements in the details of his art, he was wholly ignorant of the chemical processes involved, and hopelessly confused as to the chemical meanings of the words he used. It will not be necessary to refer to the passages in the patent which demonstrate this statement to be correct. There is entire unanimity on that point among all the experts and all the counsel. From the defendant's side we have such assertions as these: "I do not find exhibited in the patent a knowledge of scientific chemistry;" "it seems almost certain from the language of this patent that the patentee was in ignorance of the difference between the ingredients of a mixture of chemicals to be made into enamel and the constituents of the resulting enamel;" "the patentee was evidently grossly ignorant of the nature of the materials which

he employed, and of what took place when they were melted together." The principal expert for complainant says that he has "every reason to suppose that the inventor was totally ignorant of what would happen when his various ingredients were mixed together and subjected to the process of fusion." He calls the elaborate description of the process (profusely "mottled" though it is with chemical terminology) the "equivalent of a cooking recipe." One of defendant's counsel upon the argument referred to the patentee, with more truth than politeness, as a "chemical ass." This is important only as a guide to us when we come to construe the language of the patent. If the writer had only the skill of his trade, and was grossly ignorant of chemical science, it will be presumed that he used words with the meaning which would be given to them, not by chemists, but by men as ignorant—and as practical— as himself. If it be found, moreover, that he has so defined his ingredients that there can be no mistake as to what he means, and has indicated a process which will transform those ingredients into "the single coat of enamel on steel exhibiting mottled effects," which the opening sentence of the patent declares to be his invention, it makes not a particle of difference that he was wholly ignorant of all the chemical changes that take place in the course of such process.

Before taking up the patent it will be well to review in more detail the usual process of enameling. Enamel is a glass, and the substances out of which it is made must be what are known as vitrifiable; i. e., such as will be transformed into glass when subjected to the action of heat in the smelting oven. Many different formulas have long existed prescribing the kinds and proportions of these ingredients. These formulas have involved the use of some ingredient or ingredients termed "acid," and some termed "basic" or "alkaline" by enamelers; the joint presence of ingredients of both the acid and basic types being usually relied on to bring about or facilitate the required melting or "fluxing" of individual ingredients. The ingredients selected, being brought together and reduced to a suitable size, are put, in whatever proportions the particular formula calls for, into a box, and stirred together so as to mix them mechanically. This mechanical mixture of the dry ingredients is known in the enameler's art as the "mix." The mix is then put into a smelting furnace, and the ingredients are melted together at a high temperature. In this melting or fusion the volatile constituents of the ingredients are driven off, and what are left fused into a molten mass, which is run into water, and thus cooled. The resulting product is a vitreous or glass-like body, which is called the "frit." It is a new chemical compound. The frit is then placed in a grinding mill with water and clay, and is ground into a fine condition, forming a cream-like mixture or paste, which is called the "dip," because the vessel is ordinarily dipped into it. After the vessel is thus dipped, it is burned in a muffle at a high temperature sufficient to fuse the enamel which the dipping spread in a coat of greater or less thickness upon the surface.

It will be remembered that the patentee makes frequent use of

the word "alkaline," and it is a hotly contested question as to what he meant by it.   On behalf of the defendants it is argued that the ordinary meaning of the word when applied to a chemical substance or material is that it will give an alkaline reaction to an indicator, such as litmus paper.   It is suggested also that when chemical analysis shows that a compound body contains an excess of acid constituents over alkaline constituents it cannot properly be called an alkaline substance.   On the other hand, it appears that enamelers sometimes use the term as the equivalent of "basic," and apply it to the basic ingredients, which behave as fluxes relatively to the acid ingredient (usually silica), and joining with the latter to form the glass.   These basic ingredients used in the art are not composed of pure alkali, but are compounds containing alkali or alkaline metals, or nonalkaline bases, or even some acid in various proportions.   Defendant's expert Dr. Doremus admits that "chemical terms are used in the enameling art in a way not entirely in accord with the fact," and it would not be surprising to find that the unscientific patentee had so used them.   The patent itself conclusively shows in what sense Claus used the word "alkaline."   In describing the mix, which he gives as an illustrative example, he says:   "It will be observed that certain alkaline ingredients, notably feldspar, are greatly in preponderance, thus imparting to the mass an intensely alkaline characteristic."   Now, the constituents of feldspar are silica, alumina, and potash; the silica, which is concededly an acid—the chief acid constituent of enamels—being about 65 per cent.   On the other hand, feldspar is one of the best known and longest used of the materials for making enamels and glazes, and recognized in the enamelers' art as a basic substance.   Complainants' expert says that the "fluxing property—the property of uniting with silica to form a glass—   *   *   *   is notably a quality exhibited by feldspar"; and this statement is not disputed.   Other similar evidence is found in the patent, but it seems unnecessary to rehearse it.   The sentence already quoted is conclusive that when Claus used the word "alkaline" he had in mind this fluxing property, rather than the relative chemical proportions of alkali and acid in the substance to which he referred.

It will be observed that the keynote of Claus' declarations as to what his invention is is found in the phrase "intensely alkaline," or some similar expression.   Evidently he understood that it was this intense alkalinity which (in part at least) differentiated his process and product from the prior art, and thus became the test by which one might determine whether some subsequent enameler was following some prior formula, or was appropriating what Claus, by the use of this phrase, undertook to earmark as his own.

The next disputed question, therefore, to be determined is, what is it that is to be intensely alkaline (i. e., alkaline as Claus used the word), the mix or the frit?   These are two different things, for the mechanical mixture of several distinct substances in the mix is transformed in the smelting pot into a new chemical compound, which, when broken up by chemical analysis, presents a table of constituents and weights by no means the same as the aggregate tables of the chem-

ical analyses of the original substances. The defendant contends that the only alkalinity which is of any importance is the alkalinity of the frit or dip or burned coat, and the argument in support of this proposition is a very strong one. The problem is to affix a suitable coat of enamel to a metal surface. The mix never comes in contact with the metal surface. The collocation of ingredients which it contains has disappeared to be born again as a new substance before that contact comes. The capacity for diffusing itself smoothly and evenly over the metal surface; for receiving metallic salts and passing them on so as to produce oxidation and pock-marks in the metal to serve as anchorages and also ornamental mottles in the coat itself; for penetrating and hardening its tentacles in these anchorages, thus clinging firmly despite the shocks of common use; for elastic yielding as the surface to which it is adherent expands or contracts; for resistance to fruit acids, etc. —manifestly all these capacities are displayed by the enamel at stages subsequent to the mere admixture of original ingredients. The natural and logical test to select for determining whether or not an enamel is Claus' would seem to be a determination, by the most accurate means which science affords, as to what are the constituents of the enamel just before it is put in condition for application. Moreover, it would seem that such would be the safest means of identification for the inventor to adopt, otherwise it might happen that some one would appear with a frit which, when analyzed, would be found substantially identical with his own, and would therefore *presumably* (since it is the frit and dip that do the work) accomplish all the useful results which he had pointed out, and yet escape infringement, because the alkaline substances in the mix were not in great preponderance—perhaps even outweighed by the acid substances. The word "presumably" in the last sentence is italicized, because there is evidence in the case which indicates that the conclusion above expressed might not necessarily follow.

The experts for both sides unite in the statement that they know of no chemical or physical method of analysis which would enable a chemist to determine exactly how the constituents of an enamel frit are chemically united and what compounds the constituents might form. Analysis of a frit will not show accurately what ingredients were employed in making it, nor the ingredients as they exist in the enamel. It discloses only the fragments obtained by their destruction. As one of defendant's witnesses expresses it:

"Our knowledge as to what takes place when we melt together such ingredients as would produce an enamel frit amounts substantially to this: we do know that a glassy material is produced. Further than this we know very little that is at all definite or capable of proof as to the combinations which may take place among the various constituents."

Prof. Chandler, called for complainant, says:

"No one can tell exactly how the substances * * * are combined in the finished enamel, whether they represent one complex alkaline silicate, * * * or whether two, or even more, of such complex silicates exist side by side in the enamel."

In the light of this testimony it is conceivable that there may be two frits which will give tables of analyses substantially the same, and yet, by reason of differing inter-relations of their respective components, may possess different characteristics. Therefore, although the natural and logical test may seem to be the analysis of the frit, we need not be surprised to find some inventor taking his chances of establishing patentable novelty and infringement upon his statement of a formula of ingredients and proportions as introduced into the original mix. The patentee has evidently taken this course. The language of the patent is clear and positive on this point. He says:

"According to my invention, I prepare an intensely alkaline enamel, preferably by mixing various more or less vitrifiable substances, some of which are alkaline, the alkaline constituents of the mass being in great preponderance."

It is manifest from the patent that Claus did not appreciate the difference between the words "ingredients" and "constituents." In his ignorance of chemical nomenclature and of chemical reactions he evidently supposed them to be interchangeable, and used them accordingly. Now, it will be noticed that the "mass" the alkaline constituents of which are to be in great preponderance is the mass of vitrifiable substances in the mix. The "enamel" which is to be intensely alkaline is referred to again in the next sentence:

"This alkaline enamel may, however, be variously compounded, the essential feature being to obtain as a preliminary step an enamel which will give a strongly alkaline reaction."

Defendant's counsel quite accurately suggest that the word "enamel" in its ordinary meaning imports the fused substance, the glass, not the vitrifiable substances out of which the glass is made. Undoubtedly a chemist would so use the word. Indeed, the same would be expected of any well-educated writer appreciative of the meaning of the words he used and careful in their selection. But the inventor was, as we have seen, grossly ignorant of chemistry, and careless in the use of terms. He may have intended by the word "enamel" (used in the patent, as will be seen, in various collocations) to cover the particular thing he was concerned with from start to finish, sometimes in its crudest inception, sometimes more or less advanced in condition, sometimes in final use on the cooking utensil resisting the fruit acids and the shocks of daily wear and tear. The use of the phrase "as a preliminary step" would seem to indicate that in this sentence he was using it as referring to the first aggregation of vitrifiable substances in the mix. Such aggregation, when mixed, does give a strongly alkaline reaction. All doubt as to his meaning is resolved, however, in the very next sentence:

"This enamel may be brought to the proper condition for applying to the surface * * * by the common process of melting, grinding, and mixing with water."

There can surely be no doubt that the "enamel" the inventor has been heretofore referring to is the "enamel" before it has been melted. Further on in the patent he gives in detail the "one mode

of enameling under that process," naming various ingredients of which alkaline substances are to acid substances about four to one; says that in changing ingredients it is merely necessary to preserve to the enamel an intensely alkaline character; and calls attention to the fact that when the precise formula of the patent is used. "certain alkaline ingredients, notably feldspar, are greatly in preponderance, thus imparting to the mass an intensely alkaline characteristic, which, as above pointed out, is essential." Manifestly "the mass" means the mass of ingredients in the mix, and it is the intense alkalinity of that mass which is declared to be "essential"—the test of similarity or dissimilarity in the prior art, and the test of future infringement. He refers to "the intensely alkaline enamel" at various stages of its progress—reacting with the metallic oxides, intimately uniting with the metal, resisting chemical influences; but it is quite evident that he is merely carrying forward the name which he applied at the very inception of his process to the ingredients when first brought together in proper proportions, with alkaline substances in great preponderance. The conclusion from a study of the patent is that the thing whose alkalinity is determinatively characteristic of the Claus invention is the mix, the formula of ingredients which he supposed to be sufficiently new in proportions to warrant the issue of a patent. This conclusion is fortified by defendant's analysis of the Claus frit. It shows 200 pounds of acid constituents to about 88 pounds of all other constituents. Certainly the frit does not exhibit a great preponderance of alkaline constituents; and, as we have already seen, no analysis of the frit will enable even an expert chemist to determine out of what ingredients it was compounded, nor what proportion of such ingredients was alkaline.

Inasmuch as the patentee has unmistakeably selected the formula for the mix as the test of his invention, the court cannot repudiate his selection, and substitute therefor the analysis of the frit. If the theory that there may be some subtle variations in the character of the frit, produced by the specified great preponderance of alkaline ingredients in the mix, which variations analysis of the frit will not disclose, is sound, the selected test will secure him in the monopoly of his invention. But if it be not sound; if, as suggested in a hypothetical question, a formula for the mix which shows a ratio of acid to alkaline ingredients of two to one will nevertheless produce a frit which responds to analysis substantially as Claus' frit does, and also, when ground and treated as the patent indicates, produces the same result as to adherence to steel, mottling, etc.— the patent may not be of much value. But we are not dealing with any such compound now. Possibly, as suggested in one of the answers of complainants' expert, the greater cost of materials will prevent its ever troubling the patent owner or the court. It is sufficient now to decide that Claus selected the mix, and not the frit, as the earmark of his patent; that he was entitled to do so; and that the patent should be thus construed, with whatever results may follow as to prior art or infringement.

As we have seen, there were before Claus many formulæ for

making enamels by combining acid and alkaline ingredients. Is the contribution of Claus a mere change of degree of alkalinity, or such a radical departure from all prior formulæ as exhibits patentable invention? Counsel for the L. & G. Company submits a table of comparative alkalinity in the mixes of various patents, which indicates that they vary from those containing a preponderance of acid substances to those in which the ratio of alkali to acid was 1.40 to 1.00. The ratio of Claus (4.24 to 1.00) is so enormously in excess of any of the others, and apparently runs so counter to the teaching of the art, as to warrant the conclusion that his radical departure from prior methods was a patentable contribution to that art (Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; National Newsboard Co. v. Elkhart Egg Case Co., 123 Fed. 432, 59 C. C. A. 471), especially in view of the adaptability of enamel compounded in accordance with his formula to so handle the metallic salts as to secure adhesion to the metal and mottling of the coat simultaneously and on a single application.

Of the prior patents which have been introduced, Quinby & Whiting reissue No. 7,900 of 1877 is for an enamel vitreous enough to carry a glaze of itself, with an affinity for wrought or sheet iron, which causes it to adhere thereto with extreme tenacity when burned upon it. The enamel is applied in a single coat, which, when fixed, exhibits spots or mottles. A small quantity of sulphate of magnesia (an equivalent of the metallic salts of Claus) is added to the dip. Evidently the patentees do not believe that this is instrumental in producing the spots, for they state that the sulphate of magnesia is introduced for the purpose of keeping the enamel coating in proper condition for dipping, and attribute the spots to salts of iron produced by the usual pickling and cleaning of the metal surface. If the spots are in fact produced as they are in Claus' patent, it is immaterial that Quinby & Whiting were mistaken in their theory. The requisite tenacity is obtained by the use in the mix of $1\frac{1}{8}$ per cent. of arsenious acid. They assert that without this ingredient their enamel coat will not have the adhesive qualities necessary to a good enamel. The formula of Quinby & Whiting is silica 100 pounds, soda ash 35 pounds, borax 75 pounds, plaster of paris 20 pounds, arsenous acid $2\frac{1}{2}$ pounds. This gives the ratio of alkaline ingredients to acid at 1.26 to 1.00. The analysis of the Quinby & Whiting frit is substantially like that of the Claus frit, but, as we have seen, it is the character of the mix which is to be considered, and it certainly cannot be held a ratio 1.26 to 1.00 disclosed the great preponderance of alkaline ingredients, the intense alkalinity, which is exemplified in Claus formula as about 4 to 1.

The Niederinghaus patents (reissue 7,779 of 1877, No. 199,735, January 29, 1878) are for a process of enameling sheet iron by causing an oxidation of the metallic base during the process by reason of the presence of the acid (sulphuric acid) in the glaze. It is single-coat process; but, although the analysis of the frit is almost identical with that of the Claus frit, the mix is less alkaline even than Quinby & Whiting's, the ratio being 1.08 alkaline to 1.00 acid

ingredients. In the Puttman & Fligel patent (No. 336,157, February 16, 1886) there is a preponderance of acid substances in the mix; while in Milligan's patent (No. 296,206, April 1, 1884) acid and alkaline substances are about equal. These are all for single-coat enamels.

The patent to Vollrath (No. 415,485, November 19, 1889) describes a process for enameling by first fusing onto the metal a ground mass or foundation coating and afterwards applying a finishing coating presenting a "mottled or pleasingly speckled appearance." This double coating would differentiate it from Claus, but the specification says: "If desired, the finishing coating (consisting of mixtures A & B) may be applied directly to the cleaned metallic articles; but ordinarily I prefer to apply a foundation coating." These mixtures A and B, according to the formula given in the patent, are composed wholly of alkaline substances; but there is a statement that the formula may be modified by substituting for 60 parts of pulverized feldspar the feldspar mixed, if preferred, with quartz sand. The proportions of these ingredients can be arranged so as to give the great alkaline preponderance of the Claus formula. But there is no suggestion in Vollrath of mottling by metallic salts carried in or through the enamel and operating to partly oxidize the metal surface. Vollrath seeks to produce his mottling by having the two mixtures (A and B), which together make up the finishing coating, ground to different degrees of fineness. The process is somewhat analogous to that described in an earlier patent to Kegriesz, which was before this court and the Circuit Court of Appeals (Lalance & Grosjean Mfg. Co. v. Habermann Mfg. Co. [C. C.] 53 Fed. 375; Id., 55 Fed. 292, 5 C. C. A. 111), but is very far removed from Claus.

It seems unnecessary to refer in detail to the other patents given in the record. Defendant's experts both agree that the Quinby & Whiting and the Niederinghaus come nearest to the patent in suit.

A large part of the record is devoted to testimony bearing on the question of prior public use, notably by Block and by Chester Comstock. It is not thought necessary to go into the details of this testimony. As may be inferred from what has been already written, the invention of Claus was not the broad and fundamental one which counsel contends it is. It avoids prior patents only when considered as an entirety and limited to a process (and product) wherein mottles are formed in a single coat as the result of a partial oxidation of the metal surface, produced by the action of metallic salts applied to an enamel, while still moist, either on the article or in the dip, the ingredients of which enamel show a great preponderance of alkaline substances, but which enamel nevertheless does not neutralize the metallic salts, but facilitates their presentation (still efficient as oxidizing agents) to the metal surface. Parts of such a process may be found in one place or another in the prior art, but neither the patents, the literature, nor the testimony as to prior use has satisfied the court that the combined features of Claus' process were known before the date of his application; while it is satisfied that there was patentable invention in the novel combination which he devised.

Nor is it necessary to discuss the question of utility. If the formula and process which defendant has used be found to be an infringement, the large number of articles made and sold, and apparently accepted as satisfactory by the trade and consumers, is abundant evidence that the process is useful, although there may be many other processes quite as good and cheap, and producing ware quite as satisfactory.

Concededly, the defendant used a mixture which was known as "100 Granite." The two formulæ are as follows:

### Claus Patent in Suit.

| | Parts. | Alk. | Acid. |
|---|---|---|---|
| Borax | 125 | 125 | |
| Feldspar | 130 | 130 | |
| Quartz | 70 | | 70 |
| Soda | 25 | 25 | |
| Fluorspar ("small proportion"). | | | |
| Cobalt ("small proportion"). | | | |
| Saltpeter | 17 | 17 | |
| | 367 | 297 | 70 |

"Add fatty clay. Mix with enamel before applying to surface sulphate of copper and sulphate of iron or either (or equivalent metallic salts)."

### 100 Granite.

| | Lbs. | Alk. | Acid. |
|---|---|---|---|
| Borax | 90 | 90 | |
| Feldspar | 126 | 126 | |
| Quartz | 40 | | 40 |
| Soda | 32 | 32 | |
| Fluorspar | 12 | 12 | |
| Bone ash | 14 | 14 | |
| Nitrate Soda | 16 | 16 | |
| Antimony | 4 | 4 | |
| Sulphate Soda | 4 | 4 | |
| Manganese | 2 | 2 | |
| Cobalt, 16 gr. | | | |
| | 340 | 300 | 40 |

"On 100 lbs. of enamel 4 lbs. E. B. (English Ball Clay). Two pounds of nickel and 1 lb. of Epsom salts (sulphate of magnesia), hot."

When the eleven materials of defendant's formula had been mixed together mechanically, 18 ounces of sulphate of nickel in solution were sprinkled over the mixture to produce a color effect. These ingredients were then smelted, and the frit ground in a mill with one pound of natural magnesite (carbonate of magnesia), one-quarter pound of red oxide of iron, and five pounds of V clay. To the dip thus formed a solution of sulphate of magnesia was added, and sometimes a little sulphuric acid to accelerate the action of the magnesia. In this the vessels were dipped, and then burned in a muffle. Afterwards they were dipped again, and burned a second time. The expert testimony leaves little doubt that the sulphate of magnesia is the equivalent of the sulphate of copper, sulphate of iron, or equivalent metallic salts of Claus. The changes introduced by the bone ash, antimony, and magnesite, etc., are slight, and, so far as the essential feature of the Claus mix is concerned, unimportant. The substances are "neutral in glass-making." Manganese and antimony are coloring agents, bone ash "helps to make a good body of the mix." The important change in the formula is in the ratio of alkaline substances to acid; 4.24 to 1.00 in Claus, 7.50 to 1.00 in 100 Granite. Nevertheless there is still a "great preponderance of alkaline substances," and there is no suggestion that there is anything gained, or any new result effected, by thus increasing the ratio. The advance from the nearly balanced columns of the earlier patents to Claus' 4.24 to 1.00 was a radical

change; but, the new departure in that direction being once made, a still further increase of alkalinity does not necessarily put the formula outside of the scope of the patent.

The most important question in this branch of the case is whether by putting a double coat on its articles defendant avoids infringement of this patent, the object of the invention being, as stated in the specification, "to coat steel surfaces with a single coat of enamel exhibiting mottled effects"; it being further stated therein that "nothing herein stated is to be understood as precluding the application of several coats." It was the circumstance that the defendant dipped and fired a second time that induced Judge Townsend to refuse a preliminary injunction. There is fuller proof in the present record as to this second coating. When the first firing is finished, and the article has cooled off, and is set aside, it is an infringing article; a metallic article of the kind described and claimed. It is a complete article, which may be sold and used in that condition; or it may be kept an indefinite time, and then dipped again; or it may be redipped forthwith. If this infringing article were dipped in a mix which would merely coat it with a film of colorless, transparent flint glass, the second coating would not take it out of the patent. If the second coating covered it with an opaque blue glass, so that the first coat no longer "exhibited mottled effects," it might not recommend itself to persons who wanted to purchase mottled ware, but it is thought that it would be none the less an infringement. The process of the patent would still have produced the product of the patent, which the surface coating had not destroyed. If the second dip were absolutely identical with the first dip, and the result accomplished by dipping and firing a second time were precisely the same as that accomplished by the first dipping and firing, a more difficult question might be presented. But such is not the fact. The witness Louis Haberman testifies to several changes in the second dip. It would not be safe to find infringement upon his unsupported testimony, but defendant's own witnesses testify that in making the second dip a different kind of clay is used, and it seems highly probable that it is thinned with a larger proportion of water. Moreover, the evidence is persuasive that the result is a transparent coat, through which the original mottles of the first coat are all distinctly visible, and which itself exhibits no mottles, for the reason that the first coat prevents the metallic salts from coming in contact with the metallic surface, and thus producing the partial oxidation referred to in the patent as the cause of the spotted or mottled appearance. Therefore, while there are two coats on the article, only one of them is the coat of the patent, viz., a coat of enamel applied to steel (or other analogous metallic surfaces) and "exhibiting mottled effects." The conclusion is therefore reached that defendant has made and sold articles which are within the patent. It only remains to see what claims, if any, have thereby been infringed.

Claim 4 is for "as a new article of manufacture, a metallic article having a coat of enamel of an intensely alkaline nature permeated by metallic oxides, substantially as described." As we have seen,

the words "intensely alkaline" do not refer to any analysis of the frit, but to a great preponderance of alkaline substances in the mix. The words "substantially as described" indicate that the "metallic oxides" are products of the oxidation of the metal base attainable because of "the reactions between the alkaline constituents of the enamel coating and the metallic salts." It must be limited to "steel or other analogous homogeneous metallic surfaces, such as the Siemens, Martin, and Thomas products." It is valid and infringed.

Claim 1 is for "as a new article of manufacture, a steel or homogeneous iron article having one coat of mottled enamel." This is altogether too broad in view of the prior art. It is not restricted to the great preponderance of alkaline substances, which is characteristic of Claus' formula. It cannot be sustained.

Claim 2 makes no reference either to the metallic salts or to the mottles. It refers to a "preponderance"—not to a "great preponderance"—of alkaline constituents. Whether it could be saved, if it stood alone, by reading into it the essential characteristics of Claus' invention, need not be considered, because, if thus qualified, it would be but a duplicate of claim 4.

Claim 3 may be similarly disposed of. It contains no reference to the mottles, and is not confined to a "coat of enamel exhibiting mottled effects."

Claim 5 contains no reference to the "great preponderance" or "intense alkalinity" which may fairly be read in since the "coat" referred to is evidently the "coat" of claim 4. As thus qualified, it would be distinguishable from claim 4 by reason of its reference to a "partly" oxidized surface. As so qualified, it is valid and infringed.

Claims 6 and 7 must be in like manner restricted to an enamel of intense alkalinity, as those words are used in the patent. As thus qualified, they are slightly variant from claim 4. As so qualified, they are valid and infringed.

Claim 8 is for the enamel irrespective of the surface. It also must be qualified by restricting it to an enamel of intense alkalinity; i. e., having a great preponderance of alkaline substances in the mix. As so qualified, it is valid and infringed.

Claims 9, 10, 11, and 12 all refer to the process. Claim 9 reads: "The process of enameling, which consists in coating an article with an alkaline enamel and in applying thereto, while still moist, a metallic salt or salts, substantially as described." The other three contain the same phrase "and in applying thereto while still moist." When the patentee filed his application he set forth two methods of applying the metallic salts. One was to dust or sprinkle them on the enamel coating after dipping (or some suitable process) had spread the enamel in a thin layer over the metal surface; the other was to mix the salts with the enamel before it is applied to the surface to be coated. As was stated above, it is thought that Claus did not abandon either method while his application was pending in the Patent Office, and the claims for an "article of manufacture" sustained supra will cover such article in whichever of the two ways the metallic salts may be applied. But these four process claims

are all confined to the dusting or sprinkling method. It is true that the enamel is "still moist" when it is in the dip condition, but it would be an improper straining of the language used to hold that these four claims covered any process other than one in which the salts were applied to the moist enamel after such enamel had coated the article. Inasmuch as defendant does not use the dusting or sprinkling method, it cannot be held to infringe these claims.

Since all the 12 claims were insisted on, and some only have been sustained, there should be no costs to either side. A decree may be entered for injunction and accounting in conformity with this opinion. Defendant has an extensive plant, and many workmen on its pay rolls. The case was a close one, as the event has shown. It is proper that there should be a reasonable time allowed to substitute methods of manufacture which will prevent infringement. Therefore after decree is entered the court will, by order, suspend issuance of injunction for 30 days. In view of the testimony put in by defendant as to numerous noninfringing processes producing articles which they insist are as good, if not better, than complainants', that period of delay seems ample.